595 So.2d 25 (1992)
CITY OF BOCA RATON, Florida, Etc., Appellant/Cross-Appellee,
v.
STATE of Florida, Etc., et al., Appellees/Cross-Appellants.
No. 77468.
Supreme Court of Florida.
February 27, 1992.
*26 Peter L. Dame of Squire, Sanders & Dempsey, Jacksonville, Griffith F. Pitcher of Squire, Sanders & Dempsey, Miami, and Frank Bartolone, City Atty., Boca Raton, for appellant/cross-appellee.
David H. Bludworth, State Atty. and Leslie M. Ritch, Asst. State Atty., John H. Pelzer, Thomas R. Bolf and Nancy W. Gregoire of Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, and Charles F. Schoech of Caldwell & Pacetti, Palm Beach, for appellees/cross-appellants.
Robert L. Nabors and Thomas H. Duffy of Nabors, Giblin & Nickerson, P.A., and Harry Morrison, Jr., Tallahassee, amicus curiae for Florida League of Cities.
GRIMES, Justice.
This is an appeal from a final judgment which declined to validate special assessment improvement bonds proposed to be issued by the City of Boca Raton. We have jurisdiction under article V, section 3(b)(2) of the Florida Constitution, and chapter 75, Florida Statutes (1989).
In an effort to revitalize its downtown area, the City of Boca Raton (the City) determined to construct a wide range of specifically enumerated improvements in the infrastructure. The estimated cost of the improvements was $44,000,000. The City determined to obtain a portion of the money to pay the cost from the issuance of bonds in an amount not to exceed $21,000,000. The bonds were to be repaid from special assessments levied over a period of years against the downtown property to be benefitted by the improvements. The City's effort to validate the bonds was opposed by the State pursuant to chapter 75, Florida Statutes (1989), as well as by several property owners. At the trial, the issues devolved into (1) whether the City had the authority to levy special assessments to pay the bonds, and (2) even if such authority existed, whether this proposal met the legal requirements of a proper special assessment.
Following the presentation of testimony, the trial judge held that the City did not have the authority to impose special assessments to fund the bonds. In this respect, the final judgment stated in pertinent part:
12. Boca Raton lacks the power to specially assess without a specific grant of authority from the legislature. Article VII, Section 1(a) has preempted all forms of taxation other than ad valorem taxes to the State. Article VIII, Section 2(b) of the Florida Constitution does not supersede Article VII, Section 1(a) of said Constitution. Chapter 166 of the Florida Statutes does not supersede Article VII, Section 1(a) of the Florida Constitution. Only the State holds the power to impose assessments. By passing *27 Chapter 166 the State did not grant specific statutory authority to municipalities to levy special assessments. Municipalities have only been able to pass such assessments when the State which holds this power has specifically authorized municipalities to pass special assessments. No such authorization exists in today's case.
As a footnote to the judgment, the trial judge also stated:
Other findings of the Court which do not affect the outcome but which could be significant if the Court's ruling is overturned are:
A. The ad valorem assessment is not a tax, it is an assessment.
B. The assessments are directly proportional to the special benefits to be provided each parcel and the benefits are in excess of the assessments.
C. The improvements are properly treated as a single project. Improvements need not necessarily be abutting, adjoining or even completely within the District.
D. Excluded parcels would at most receive only insignificant special benefits.
E. All notice provisions required by law have been fulfilled.
In deciding whether the City has authority to impose special assessments to pay off the bonds, it is necessary to recount the history of municipal powers in Florida. Under the constitution of 1885, all municipal powers were dependent upon a specific delegation of authority by the legislature in a general or special act. Article VIII, section 8 of the 1885 constitution provided in pertinent part:
The Legislature shall have power to establish, and to abolish, municipalities to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time.
Powers not granted a municipality by the legislature were deemed to be reserved to the legislature. This reservation of authority was known as "Dillon's Rule" as expressed in John F. Dillon, The Law of Municipal Corporations § 55 (1st ed. 1872). Under the 1885 constitution, the Florida courts consistently followed Dillon's Rule. See, e.g., Williams v. Town of Dunnellon, 125 Fla. 114, 169 So. 631 (1936); Heriot v. City of Pensacola, 108 Fla. 480, 146 So. 654 (1933); Amos v. Mathews, 99 Fla. 1, 126 So. 308 (1930); Malone v. City of Quincy, 66 Fla. 52, 62 So. 922 (1913).
As Florida's population began to boom after World War II, the legislature was flooded with local bills and population acts designed to permit municipalities to provide solutions to local problems. Thus, when our constitution was amended in 1968, municipalities were granted broad home rule powers under article VIII, section 2(b), which provides in pertinent part:
(b) POWERS. Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law.
Talbot D'Alemberte, the reporter for the Constitutional Revision Commission, described the difference between the above-quoted provisions of the 1968 and the 1885 constitutions as follows:
The apparent difference is that under the new language, all municipalities have governmental, corporate and proprietary powers unless provided otherwise by law, whereas under the 1885 Constitution, municipalities had only those powers expressly granted by law.
26A Fla. Stat. Ann. 292 (1970) (Commentary by Talbot "Sandy" D'Alemberte).
In the first litigated case involving the scope of municipal powers decided after the adoption of the 1968 constitution, this Court held that the City of Miami Beach had no power to enact a rent-control ordinance in the absence of a legislative enactment authorizing the exercise of such a power. City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801 (Fla. 1972). Prompted by this decision, the legislature in 1973 enacted the Municipal Home Rule *28 Powers Act,[1] now codified in chapter 166, Florida Statutes (1989). Thereafter, this Court upheld a subsequent rent-control ordinance enacted by the City of Miami Beach on the premise that section 166.021(1) now authorized municipalities to exercise any power for municipal purposes except when expressly prohibited by law. City of Miami Beach v. Forte Towers, Inc., 305 So.2d 764 (Fla. 1974). Thereafter, we acknowledged the vast breadth of municipal home rule power when we said:
Article VIII, Section 2, Florida Constitution, expressly grants to every municipality in this state authority to conduct municipal government, perform municipal functions, and render municipal services. The only limitation on that power is that it must be exercised for a valid "municipal purpose." It would follow that municipalities are not dependent upon the Legislature for further authorization. Legislative statutes are relevant only to determine limitations of authority.
State v. City of Sunrise, 354 So.2d 1206, 1209 (Fla. 1978).
Section 166.021 provides in pertinent part:
(1) As provided in s. 2(b), Art. VIII of the State Constitution, municipalities shall have the governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law.
(2) "Municipal purpose" means any activity or power which may be exercised by the state or its political subdivisions.
(3) The Legislature recognizes that pursuant to the grant of power set forth in s. 2(b), Art. VIII of the State Constitution, the legislative body of each municipality has the power to enact legislation concerning any subject matter upon which the state Legislature may act, except:
(a) The subjects of annexation, merger, and exercise of extraterritorial power, which require general or special law pursuant to s. 2(c), Art. VIII of the State Constitution;
(b) Any subject expressly prohibited by the constitution;
(c) Any subject expressly preempted to state or county government by the constitution or by general law; and
(d) Any subject preempted to a county pursuant to a county charter adopted under the authority of ss. 1(g), 3, and 6(e), Art. VIII of the State Constitution.
(4) The provisions of this section shall be so construed as to secure for municipalities the broad exercise of home rule powers granted by the constitution. It is the further intent of the Legislature to extend to municipalities the exercise of powers for municipal governmental, corporate, or proprietary purposes not expressly prohibited by the constitution, general or special law, or county charter and to remove any limitations, judicially imposed or otherwise, on the exercise of home rule powers other than those so expressly prohibited.
Thus, a municipality may now exercise any governmental, corporate, or proprietary power for a municipal purpose except when expressly prohibited by law, and a municipality may legislate on any subject matter on which the legislature may act, except those subjects described in paragraphs (a), (b), (c), and (d) of section 166.021(3). The provisions of section 166.021(3)(a) and (d) are irrelevant to the instant case. Therefore, it would appear that the City of Boca Raton can levy its special assessment unless it is expressly prohibited by law  section 166.021(1), expressly prohibited by the constitution  section 166.021(3)(b), or expressly preempted to the state or county government by the constitution or by general law  section 166.021(3)(c).
In this respect, those opposing the bond issue make two arguments. First, they contend that the special assessment is really a tax, which the City may not impose because of the language of article VII, section 1(a) of the Florida Constitution, which provides:

*29 (a) No tax shall be levied except in pursuance of law. No state ad valorem taxes shall be levied upon real estate or tangible personal property. All other forms of taxation shall be preempted to the state except as provided by general law.
However, a legally imposed special assessment is not a tax. Taxes and special assessments are distinguishable in that, while both are mandatory, there is no requirement that taxes provide any specific benefit to the property; instead, they may be levied throughout the particular taxing unit for the general benefit of residents and property. On the other hand, special assessments must confer a specific benefit upon the land burdened by the assessment. City of Naples v. Moon, 269 So.2d 355 (Fla. 1972). As explained in Klemm v. Davenport, 100 Fla. 627, 631-34, 129 So. 904, 907-08 (1930):
A tax is an enforced burden of contribution imposed by sovereign right for the support of the government, the administration of the law, and to execute the various functions the sovereign is called on to perform. A special assessment is like a tax in that it is an enforced contribution from the property owner, it may possess other points of similarity to a tax but it is inherently different and governed by entirely different principles. It is imposed upon the theory that that portion of the community which is required to bear it receives some special or peculiar benefit in the enhancement of value of the property against which it is imposed as a result of the improvement made with the proceeds of the special assessment. It is limited to the property benefited, is not governed by uniformity and may be determined legislatively or judicially.
... .
... [I]t seems settled law in this country that an ad valorem tax and special assessment though cognate in immaterial respects are inherently different in their controlling aspects... .
There are two requirements for the imposition of a valid special assessment. First, the property assessed must derive a special benefit from the service provided. Atlantic Coast Line R.R. v. City of Gainesville, 83 Fla. 275, 91 So. 118 (1922). Second, the assessment must be fairly and reasonably apportioned among the properties that receive the special benefit. South Trail Fire Control Dist. v. State, 273 So.2d 380 (Fla. 1973). Thus, a special assessment is distinguished from a tax because of its special benefit and fair apportionment. We do not believe that the special assessment proposed by the City constitutes a tax which would be prohibited by article VII, section 1(a) of the Florida Constitution.[2]
As their second argument, the State and the property owners contend that by virtue of the enactment of chapter 170, Florida Statutes (1989), which authorizes municipalities to impose special assessments upon certain conditions, the legislature has preempted the authority of municipalities to impose special assessments under any other circumstances. It is conceded that the City of Boca Raton did not follow the requirements of chapter 170 in its attempt to impose special assessments in this case. This argument cannot prevail because it is evident that chapter 170 is not the only method by which municipalities may levy a special assessment. Thus, section 170.19, Florida Statutes (1989), states that "[t]his chapter ... shall be construed as an additional and alternative method for the financing of the improvements referred to herein." Further, section 170.21, Florida Statutes (1989), states that "[t]his chapter shall not repeal any other law relating to the subject matter hereof, but shall be deemed to provide a supplemental, additional, and alternative method of procedure for the benefit of all cities, towns, and municipal corporations of the state... ."[3]
*30 This Court has recently construed a provision similar to sections 170.19 and 170.21 to find that counties had sufficient home rule power to issue bonds irrespective of the existence of a statute which authorized counties to issue bonds. In Taylor v. Lee County, 498 So.2d 424 (Fla. 1986), the county sought to issue bonds to finance a new bridge pursuant to its home rule authority. Taylor argued that since chapter 159, Florida Statutes (1985), specifically authorized the county to issue bonds, the county ordinance must rely on and conform to that chapter. The Court noted that section 159.14, Florida Statutes, by its express terms, provided supplemental and additional authority to that conferred by other laws. The Court concluded that chapter 125, Florida Statutes (1985) (the county home rule statute) gave the county ample authority to issue the bonds and held that in areas in which a noncharter county has authority to act, it may choose between adopting an ordinance pursuant to its home rule power or adopting it pursuant to another statutory authority.
In addition, the premise that chapter 170 is not considered the exclusive means of making special assessments was reaffirmed last year when the legislature amended section 197.3631, Florida Statutes (1989), to read in part: "Section 197.3632 is additional authority for local governments to impose and collect non-ad valorem assessments supplemental to the home rule powers pursuant to ss. 125.01 and 166.021 and chapter 170, or any other law." Ch. 90-343, § 7, Laws of Fla.
We note that chapter 170 was enacted in 1923, fifty years before the Municipal Home Rule Powers Act. Therefore, no legislative intent that it would be the sole method of passing special assessments can be inferred from its presence. The fact that it was not one of the many statutes repealed by the Municipal Home Rule Powers Act does not evince a similar legislative intent in the absence of language indicating that it is intended to be exclusive. Thus, we hold that the City of Boca Raton had the authority to impose a special assessment under its home rule power.
We now turn to the legality of the special assessment which underlies the bond issue proposed by the City of Boca Raton. The opponents' primary contention is that the special assessments are not directly proportional to and less than the special benefits to be provided each parcel. They also argue that certain properties are improperly excluded from the assessments. At the outset, we note that the City made specific findings that the improvements would constitute a special benefit to the subject property, that the benefits would exceed the amount of the assessments, and that the benefits would be in proportion to the assessments. The apportionment of benefits is a legislative function, and if reasonable persons may differ as to whether the land assessed was benefitted by the local improvement, the findings of the city officials must be sustained. Rosche v. City of Hollywood, 55 So.2d 909 (Fla. 1952).
To better understand the opponents' position, it is necessary to discuss the manner in which the proposed assessments will be made. The City's ordinance permits and its resolution provides that the special assessments are to be apportioned among the benefitted properties in relation to the property values of the various tracts as determined by the latest available real property assessment roll prepared by the county tax appraiser. Robert J. Harmon, the City's urban economic consultant, testified that his analysis showed that the subject properties "would at least on a cumulative basis receive $7 of benefit for every $1 that they were paying in assessments." He expressed the opinion that the use of ad valorem values in making special assessments, which has been nationally recognized for at least twenty years, was the most equitable method that could be employed for the City's project. He gave an example of what he called the self-correcting mechanism of the ad valorem method when he stated:

*31 If a property, for example, initially represented one percent of the entire tax base of downtown Boca Raton, they would pay one percent of the assessment. If over ten years the assessed value of that particular property, if it did not benefit to the same degree as the rest of downtown, their percentage of the total assessment would go down proportionally.
And the reverse would be also true. If a property benefitted more in its total percentage of the total assessed value of downtown increased, as will be the case with particularly the large developments, their percentage of the total assessment increases.
He added that if in any given year a property owner felt that his benefit was inequitable there was an appeal process in place by which he could seek to have his assessment adjusted. When asked how an improved property could receive the same proportional benefit as a vacant lot, he explained that while improved property would initially pay a higher assessment, over a period of time the cumulative payments would tend to equalize because the vacant properties as they were developed would ultimately carry higher assessments due to increased construction costs.
Mr. Harmon also testified that the small number of residential properties in the downtown area as well as churches had been excluded from the assessment because they would receive much less benefit from the project than business properties. However, he pointed out that should those properties be changed to a business use, they would then be subject to the assessment.
The trial court found against the bond opponents on these issues. From our review of the record, we conclude there is competent substantial evidence to support these findings. The City was not required to specifically itemize a dollar amount of benefit to be received by each parcel. See Cape Dev. Co. v. City of Cocoa Beach, 192 So.2d 766 (Fla. 1966). Moreover, we reject the contention that the assessment cannot be sustained because it will be applied on an ad valorem basis. In fact, in an early case this Court upheld a special assessment for local improvements which was imposed upon an ad valorem basis. Richardson v. Hardee, 85 Fla. 510, 96 So. 290 (1923); see also City of Naples v. Moon, 269 So.2d 355 (Fla. 1972) (approving special assessment based in part upon assessed values). As we explained in Meyer v. City of Oakland Park, 219 So.2d 417, 419-20 (Fla. 1969):
Many elements enter into the question of determining and prorating benefits in a case of this kind. They are physical condition, nearness to or remoteness from residential and business districts, desirability for residential or commercial purposes, and many other peculiar to the locality where the lands improved are located. As stated by the Court in City of Ft. Myers v. State of Florida and Langford, 95 Fla. 704, 117 So. 97, 104:
"No system of appraising benefits or assessing costs has yet been devised that is not open to some criticism. None have attained the ideal position of exact equality, but, if assessing boards would bear in mind that benefits actually accruing to the property improved in addition to those received by the community at large must control both as to benefits prorated and the limit of assessments for cost of improvement, the system employed would be as near the ideal as it is humanly possible to make it."
While front foot or square foot methodologies for apportioning costs of special improvement projects are more traditional, other methods are permissible. As we stated in South Trail Fire Control District v. State, 273 So.2d 380, 384 (Fla. 1973):
The manner of the assessment is immaterial and may vary within the district, as long as the amount of the assessment for each tract is not in excess of the proportional benefits as compared to other assessments on other tracts.
We do not believe that Fisher v. Board of County Commissioners, 84 So.2d 572 *32 (Fla. 1956), mandates a contrary result. In that case, there was no credible evidence that the amount of the benefit was related to the property valuation.
We reverse the final judgment and remand with directions that the bond issue be approved.[4]
It is so ordered.
OVERTON, BARKETT, KOGAN and HARDING, JJ., concur.
McDONALD, J., concurs in part and dissents in part with an opinion, in which SHAW, C.J., concurs.
McDONALD, Justice, concurring in part and dissenting in part.
I concur with the holding that Florida municipalities possess the constitutional and statutory power to impose special assessments by ordinance and that the City of Boca Raton could lawfully impose a valid special assessment. I part company with the majority and the trial judge where they conclude that the proposal under scrutiny is a valid special assessment. Reviewing the evidence in the light most favorable to the City, I fail to find any special benefits to the assessed properties or its owners. There is a general benefit to all the citizens of the City. Hence, I believe that the project can only be paid by taxes, which requires a referendum and assessment against all taxpayers. I would therefore disapprove the bonds.
SHAW, C.J., concurs.
NOTES
[1] Ch. 73-129, § 1, Laws of Fla.
[2] We also note that the trial judge held that the proposed levy was a special assessment and not a tax. If it is not a tax, it is not preempted to the State under article VII, section 1(a) of the Florida Constitution.
[3] The title assigned to chapter 170 also reflects this intent. The title reads "Supplemental and Alternative Method of Making Local Municipal Improvements."
[4] As in other bond validation cases, we do not pass upon the economic desirability of these bonds but only upon whether they may be legally issued.